**GERSTEN SAVAGE LLP**
Paul Rachmuth (PR1566)
600 Lexington Avenue
New York, New York 10022
Telephone: (212) 752-9700
Facsimile: (212) 980-5192
Proposed Counsel to the Debtor
and Debtor-in-Possession

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>TETRAGENEX PHARMACEUTICALS, INC.[1]<br><br>Debtor | Chapter 11<br><br>Case No. _____ |

**DECLARATION OF MARTN SCHACKER IN SUPPORT OF THE DEBTOR'S
FIRST DAY MOTIONS AND CONFIRMATION OF THE DEBTOR'S
PREPACKAGED PLAN OF REORGANIZATION**

I, Martin Schacker, declare under penalty of perjury that the following statements are true to the best of my knowledge after due inquiry:

1. I am the Chief Executive Officer of Tetragenex Pharmaceuticals, Inc., the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "**Debtor**"). As such, I am fully familiar with the facts and circumstances described herein.

2. I am submitting this declaration (this "**Declaration**") in support of (I) the Debtor's motion establishing bar dates (the "**Bar Date Moton**") and (II) the Debtor's motion (the "**Scheduling Motion**") seeking entry of an order (the "**Scheduling Order**"), pursuant to 11 U.S.C. §§ 105(a), 1126(b) and 1128 and Rules 2002, 3017, 3018 and 3020 of the Federal Rules

---

[1] The last four digits of the Debtor's federal tax identification number, are 1895 The Debtor's mailing address for purposes of this case is 6901 Jericho Tpk., Ste 221, Syosset, New York 11791.

of Bankruptcy Procedure: (a) scheduling a combined hearing (the "**Combined Hearing**") on the adequacy of the Disclosure Statement for the Prepackaged Plan of Reorganization of Tetragenex Pharmaceuticals, Inc., dated August 10, 2010 (the "**Disclosure Statement**") and confirmation of the Prepackaged Plan of Reorganization of Tetragenex Pharmaceuticals, Inc., dated August 10, 2010 (the "**Plan**");[2] (b) approving the form and manner of notice of the Combined Hearing (the "**Combined Hearing Notice**"); (c) approving the Debtor's prepetition solicitation procedures (the "**Solicitation Procedures**"); (d) establishing appropriate objection deadlines in conjunction therewith; and (e) granting related relief.

## I. BACKGROUND

3. As described more fully below, on August 12, 2010, the Debtor commenced solicitation of votes for the acceptance of the Plan by, among other things, mailing a copy of the Plan, the Disclosure Statement For Solicitation Of Votes On The Prepackaged Plan Of Reorganization Of Tetragenex Pharmaceuticals, Inc. (the "Disclosure Statement") and ballots for acceptance or rejection of the Plan to all creditors and interest holders impaired under the Plan. All Impaired Classes voted overwhelmingly to accept the Plan.

4. Now, (the "**Petition Date**"), the Debtor has filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**") with the intent of confirming the Plan.

5. The Debtor continues to operate its business and manage its affairs as debtor-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

6. No trustee, examiner or committee has been requested or appointed in the Chapter 11 Case.

---

[2] Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan.

**The Debtor's Business**

7.  The Disclosure Statement contains a detailed description of the Debtor's business. I have reviewed the contents of the Disclosure Statement. All material factual statements contained therein are true and correct to the best of my knowledge after due inquiry. The factual statements in the Disclosure Statement are incorporated herein by reference.

8.  The Debtor is a pharmaceutical company that has spent the past sixteen years developing a platform of peptides to treat depression. Nemefitide, the Company's lead drug, has been administered to over 430 human patients in 13 Food and Drug Administration (the "**FDA**") condoned trials, reaching late Phase II. The drug has shown virtually no side effects in humans and was efficacious in a large percentage of patients. These successes include the treatment of refractory patients; those patients who have failed to respond to many other currently available therapies. In the drug trials, patients usually required 6 to 9 doses over 1 to 2 week period. The positive effects of the treatment generally lasted six months.

9.  The Debtor holds the United States patents on Nemifitide through 2014. Unfortunately, this leaves insufficient time remaining on its patents to successfully complete all necessary testing and marketing required to make the drug commercially viable in the United States. It, therefore, is necessary to change the focus of the company's strategy.

10.  There are numerous countries outside of the United States in which Nemefitide can be registered based on the testing already conducted (a complete preclinical regimen, an extensive phase I program and a well-progressed, human phase II program). The Debtor intends to register its drugs through business partners in these countries and, in conjunction with these business partners, provide treatment in existing facilities.

11. The program would be run similar to many excursion spa/medical tourism businesses: The Debtor will provide patients with a packaged solution that would include travel arrangements, concierge services, facility charges and medical treatment and monitoring.

12. The Debtor does not believe this treatment process will be an impediment. The target patients are those who have failed to respond to current therapies and have no other options. Accordingly, many will be willing to travel in order to receive a treatment. Further, providing a complete travel and treatment solution to patients allows the Debtor to increase its revenue from each treated patient.

**The Capital Structure**

13. Immediately prepetition, the Debtor held approximately $40,000[3] in its bank accounts and had liabilities of about $3.6 million, consisting of $85,000 in Secured Claims (Class 2), $35,000 in Priority Claims (Unclassified and Class 1 Claims) and $ 3.5 million in General Unsecured Claims (Class 3). As described more fully below, the Plan provides for Secured Claims to be paid in full unless the holder agrees to a less favorable treatment. In this case, the Class 2 Holder has agreed to receive equity in the reorganized company in satisfaction of its debt. Similarly, though Priority Claims are to be paid in full unless the holders agree to less favorable treatment, holders of all known priority claims have agreed to receive equity in the reorganized company as payment of their claims. And finally, under the Plan, General Unsecured Claims receive equity in the reorganized company as payment of their claims. Based

---

[3] The $40,000 currently held by the Debtor primarily comes from a May 2010 investment from an existing individual investor. The transaction consisted of a private equity sale of 2,872,222 common shares in exchange for $50,000. This individual investor was fully advised of the Debtor's pending bankruptcy filing and has supported the process including voting in favor of the Plan.

on the foregoing, the Debtor expects over $100,000 will be available at the time of the Plan's effective date to fund its emergence from bankruptcy.

14. As discussed below, the Debtor has raised $85,000 from the Subscription and may raise an additional $100.000 to $200,000 through the Subscription prior to the Plan Effective Date and the Subscription's closing.

15. This $185,000 to $285,000 in newly raised capital along with the $40,000 in cash on hand not only covers the Debtor's funding needs to emerge from bankruptcy protection, it will fund the Debtor's operations until the reorganized company to move forward with its business plan and become cash-flow positive and profitable. Pro forma cash flow projections and balance sheet will be filed with the Plan Supplement prior to the Confirmation Hearing.

**The Equity Subscription**

16. All Claim and Interest Holders have been given the opportunity to contribute additional capital to purchase additional shares of Common Stock (the "**Subscription**"). As described in the Disclosure Statement, concurrently with soliciting votes for the acceptance or rejection of the Plan, the Debtor solicited participation in the Subscription (the "**Subscription Agreement**") to every claim and interest holder. The features of the Subscription include:

  a. New equity interests in the reorganized Debtor are being sold at $.03/share; the same price that Class 3 Claims (General Unsecured Claims) are to be converted under the Plan;

  b. Only those existing creditors and interest holders were solicited or permitted to participate;

  c. A maximum of 36,000,000 shares were being offered;

  d. All funds received pursuant to the Subscription are being held in escrow by JP Morgan Chase Bank, N.A. pending the closing of the Subscription.

17. The Subscription Agreement was to expire on September 3, 2010 or some later date as the Debtor so chose. The Debtor has elected to keep the Subscription open until the Plan's Effective Date, thereby allowing the Debtor to close on the Subscription Agreement at the same time as it closes on the confirmed Plan.

18. As of the Petition Date, the Debtor has received $85,000 under the Subscription, which is being held in escrow. In addition, the Debtor has received commitments and expressions of interest for an additional $100,000 and $200,000 respectively.

## II    CHAPTER 11 CASES

19. The Debtor commenced its Chapter 11 Case to effectuate a restructuring of its balance sheet (converting debt to equity) pursuant to the Plan, which, as described in more detail below, has the support of each and every impaired class of claims and interests.

**The Proposed Prepackaged Plan**

20. Prior to the Petition Date, after months of discussions and negotiations with various creditor and interest holder constituencies, and after considering various alternatives, the Debtor reached an agreement on the terms of the Plan with the vast majority of all claim and interest holders.

21. The Plan provides for a balance sheet restructuring that converts all secured and general unsecured Claims into equity, dilutes but not eliminates existing equity and leaves the place the strike price and expiration date for all existing options and warrants (all of which are expected to remain "far out of the money"). Furthermore, the Plan also allows for the Debtor to consummate the Subscription and thereby raise the capital necessary to complete its business plan.

22. The Debtor commenced solicitation of votes for acceptance of the Plan by circulating the Disclosure Statement, with the Plan as an exhibit, ballots for the appropriate Class or Classes, the Solicitation Agreement and a letter from the Debtor explaining the process and urging the creditors and interest holders to vote in favor of the Plan (collectively the "**Solicitation Package**") on August 12, 2010. A copy of the Solicitation Package is annexed hereto. The solicitation period ended on September 3, 2010 (the "**Voting Deadline**")[4].

23. The Debtor's cash on hand is not subject to the liens of any creditors. The Debtor, therefore, does not need consent from any party for the use of cash collateral. Further, the Debtor currently has a very small operation and does not incur high daily operating costs and anticipates that it will not need additional funding during the pendency of this bankruptcy proceeding. This projection assumes, however, confirming the Plan in the timeframe discussed herein. A projected operating budget for the postpetition period will be included in the Plan Supplement.

**Approval of Solicitation Procedures and Forms of Ballots.**

24. Prior to the Petition Date, the Debtor solicited votes for acceptance of the Plan, as follows:

   a. The Debtor established August 10, 2010 as the Voting Record Date (the "Voting Record Date");
   b. On August 12, 2010, the Debtor, through the Voting Agent, caused a copy of the Solicitation Package to be delivered via first-class mail to each creditor and interest holder entitled to vote to accept or reject the Plan;
   c. The Debtor established September 3, 2010 at 5:00 p.m. (prevailing Eastern Time), as the Voting Deadline;
   d. The Ballots clearly stated that all Ballots must be properly executed, completed, and delivered to the Voting Agent, so that they are received by the Voting Agent no later than the Voting Deadline. The Ballots also contain other instructions,

---

[4] Though the Voting Deadline was September 3, 2010, the Debtor granted a voting extension to all parties so requesting. No votes in any Class have been deemed late.

depending on the type of Ballot received by each creditor or interest holder entitled to vote. Further, the Debtor has granted an extension to the Voting Deadline to any party requesting one;

e. The Debtor solicited acceptances and rejections of the Plan only from Holders of Claims and Interests in Classes 3, 4 and 5 (the "Voting Classes");

f. All known creditors in Classes 1 and 2, which are deemed to accept the Plan, have been provided copies the Plan and Disclosure Statement;

25. At the time solicitation commenced, the Plan had been developed through discussions and negotiations with various creditor constituencies. As a result, the Holders of a much, if not most of all Claims and Interests had significant familiarity with, and had ample opportunity to provide input on, the Plan's material terms prior to receipt of the Solicitation Package. A longer solicitation period would, therefore, have only caused additional unnecessary delays to the restructuring of the Debtor's business.

### III  REQUIREMENTS FOR PLAN CONFIRMATION

**The Plan's Provisions are Consistent With the Bankruptcy Code**

26. The Plan contains provisions regarding (a) the impairment and unimpairment of Classes of Allowed Claims and Equity Interests, (b) the assumption or rejection of executory contracts and unexpired leases, and (c) procedures for resolving Claims.

27. The Plan also contains standard release and exculpation provisions for the Debtor and certain non-Debtor third parties, and provides that the Bankruptcy Court shall retain jurisdiction as to specified issues. See Article XII of the Plan.

**The Plan has been Proposed in Good Faith and Not By Any Means Forbidden by Law**

28. The Debtor, its management and professionals have remained cognizant of and have fulfilled their fiduciary duties to all stakeholders and have worked consistently and diligently toward formulating a plan that is in the best interests of all creditors, The Plan is the

product of extensive, arm's length negotiations among the Debtor, the creditors and interest holders, which is evidenced by their support of the Plan.

29. The Debtor believes that the Plan maximizes the value of the estate for its creditors and interest holders.

**The Plan Provides for Bankruptcy Court Approval of Payment for Services and Expenses**

30. Any agreement by which the Debtor retained and/or employed a professional person to provide services to the Debtor in, or in connection with, the Chapter 11 Cases has been disclosed to the Bankruptcy Court in applications to retain and/or employ such professionals.

31. All fees and expenses of the foregoing professionals are subject to final approval by the Bankruptcy Court. Moreover, Article XI of the Plan sets forth the requirements and procedures for filing fee claims and provides that such fees and expenses of professional persons retained in the Chapter 11 Case that have been properly filed and served shall be payable to the extent approved by order of the Bankruptcy Court. In addition, Article XIII of the Plan provides for the Bankruptcy Court's retention of jurisdiction to hear and determine all fee claims.

**The Plan Does Not Contain Rate Changes**

32. The Plan does not propose any rate changes subject to the jurisdiction of any governmental regulatory commission.

**The Plan Satisfies The "Best Interests Test"**

33. Debtor's management estimated the range of liquidation values the Debtor that would be generated from a hypothetical liquidation under chapter 7 of the Bankruptcy Code, which is described in Article XVI of the Disclosure Statement (the "**Liquidation Analysis**"). The Liquidation Analysis is based on certain estimates and assumptions regarding liquidation proceeds that, although developed and considered reasonable by the Debtor's management, are

inherently subject to significant business, economic and regulatory uncertainties and contingencies beyond the control of the Debtor and its management, and is subject to all the qualifications and limitations set forth therein and in the Disclosure Statement. The Liquidation Analysis provides that the estimated recoveries for each impaired Class of Claims currently receiving distributions under the Plan are estimated to be greater than or equal to the distributions they would receive in a hypothetical chapter 7 liquidation.

34. As each holder of a Claim in an impaired Class has either voted to accept the Plan and/or will not receive less under the Plan than they would receive in a hypothetical chapter 7 liquidation, I believe that the Plan meets the so-called "best interests tests."

**Acceptance By Certain Classes**

35. Claims and Interests in Classes 1 and 2 are not impaired under the Plan and such Classes (and all holders of Claims and Interests in such Classes) are conclusively presumed to have accepted the Plan.

36. Further, based on my review of the Voting Declaration, the holders of Claims and Interests in Classes 3, 4 and 5 have voted to accept the Plan by the requisite majority required by the Bankruptcy Code for each such Class.

**The Plan Provides for Payment in Full of Allowed Administrative Claims, Professional Fee Claims and Allowed Priority Tax Claims**

37. Pursuant to Article II of the Plan, Administrative Claims, Professional Fee Claims, and Priority Tax Claims, will, to the extent Allowed, be paid in full unless a holder of such Claim agrees to less favorable treatment. If the Plan is confirmed, the Debtor will have sufficient funds to pay all such Claims in full.

**To the Extent Any Class of Claims is Impaired Under the Plan, at Least One Class of Impaired Claims has Accepted the Plan**

38. The holders of Claims in Classes 3, 4, and 5 are impaired under the Plan. As set forth in the Voting Declaration, the holders of Claims all of these Classes have voted overwhelmingly to accept the Plan.

**Feasibility**

39. I understand that the Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor unless such liquidation or reorganization is proposed in the Plan.

40. The Reorganized Debtor has sufficient resources to make the payments anticipated by the Plan within the timeframe proposed therein, as well as sufficient liquidity to meet ongoing working capital needs following confirmation of the Plan.

**Principal Purpose of the Plan**

41. The Plan has not been filed for the purpose of avoidance of taxes or the application of section 5 of the Securities Act.

**IV     THE POST-EFFECTIVE DATE PROTECTIONS**

42. The beneficiaries of the release, Exculpation and injunction provisions set forth in Article XII of the Plan have contributed significantly to the Chapter 11 Case. Further, I am not aware of any legitimate potential claims or causes of action that would otherwise be asserted against such persons. The exculpation provision offers limited protection and excludes liability determined to constitute gross negligence, willful misconduct, intentional fraud or criminal conduct, and further does not release any actions that may arise after the Effective Date.

## V    ADVERSE CONSEQUENCES OF NON-CONFIRMATION

43. In formulating and developing the Plan, the Debtor explored other alternatives and engaged in an extensive negotiating process with its creditors and interest holders. If the Plan is not confirmed, much of the success reached by the Debtor and other parties in interest in their negotiations and their long-standing efforts to reach a consensual resolution will be squandered. As a result, I believe that failure to confirm the Plan will lead inevitably to the liquidation of the Debtor under chapter 7 of the Bankruptcy Code. I believe that such a liquidation would result in lower aggregate distributions being made to creditors than those provided for in the Plan. See Liquidation Analysis, Article XVI of the Disclosure Statement.

## VI    CONCLUSION

44. Based upon the facts set forth herein and law as I understand it, I believe that the Plan satisfies all of the applicable confirmation requirements contained in the Bankruptcy Code, and that due and adequate notice of the Confirmation Hearing, the Voting Deadline, and the deadline for objecting to confirmation of the Plan was properly given. I further believe that the Plan is feasible and that the Debtor is able to make the payments anticipated by the Plan.

Therefore, I respectfully request that the Court (a) grant the Motion, and (b) grant the Debtor such other and further relief as is just or proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of October 2010.

/s/
Martin Schacker
Chief Executive Officer
Tetragenex Pharmaceuticals, Inc.